Filed 4/11/17

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C072881 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF120516) |
| v. | |
| BRADY DEE DOUGLAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, Paul K. Richardson, Judge. Remanded for further proceedings with directions.

Kieran D. C. Manjarrez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillete, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Kari Ricci Mueller, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

1

After defendant Brady Dee Douglas's former boyfriend, a male prostitute, told him Jeffrey B. had shorted him money following a prearranged sexual encounter, defendant and codefendant Clifton Sharpe tracked down Jeffrey and demanded the unpaid money. During a high speed freeway chase, Jeffrey swerved his car into defendant's vehicle after defendant pointed a gun at him, shooting several times. Jeffrey was able to escape unharmed.

A jury convicted defendant of attempted second degree robbery (Pen. Code, §§ 21a, 211, 212.5, subd. (c) & 213, subd. (b); unless otherwise set forth, section references that follow are to the Penal Code), assault with a semiautomatic firearm (§ 245, subd. (b)), shooting at an occupied motor vehicle (§ 246), drawing or exhibiting a firearm against a person in a motor vehicle (§ 417.3), and carrying a loaded firearm with intent to commit a felony (§ 12023, subd.(a)). The jury found true certain firearm enhancements attached to the robbery and assault charges. (§ 12022, subd. (a)(1) and 12022.5, subd. (a).) It acquitted defendant of pimping (§ 266h, subd. (a)), and found not true other alleged firearm enhancements. (§ 12022.53, subds. (b) & (c).) Defendant was sentenced to an aggregate term of six years in state prison.

On appeal, defendant contends the court erred in denying his *Wheeler* motion after the prosecutor peremptorily excused two openly gay prospective jurors. (*People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); see also *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*).) He also argues the court erroneously instructed the jury with CALCRIM No. 460, the pattern jury instruction for attempt, which he asserts is unconstitutionally vague and impermissibly creates a mandatory presumption concerning an accused's intent. We reject defendant's instructional error challenge, but find the court did not properly evaluate defendant's *Batson/Wheeler* motion. We therefore remand for further proceedings as discussed below.

FACTS AND PROCEEDINGS

A.      *The Incident*

In October 2011, defendant lived in Sacramento with Martin Andrade [defendant's former boyfriend] and Sharpe.  At the time, Andrade was working as a male escort or prostitute.  Andrade had arranged for Jeffrey to come to the house, where they engaged in sexual activities.  Although defendant and Sharpe were home at the time, Jeffrey did not see them when he arrived at the house.

After Jeffrey left, Andrade told defendant that Jeffrey had not paid the amount they had agreed upon for his services.  Defendant and Sharpe then left the house to find Jeffrey.  Sharpe was driving and defendant was in the front passenger seat.

Defendant and Sharpe caught up to Jeffrey's car a short distance from the house.  They pulled alongside his car and defendant yelled, "Where's your money at?  Where is the money at?"

Jeffrey drove off and defendant and Sharpe followed.  Jeffrey became concerned and ran several stoplights to try to get away.  He eventually got on the freeway and tried to lose defendants.  A high speed chase ensued.  Defendant threw a water bottle at Jeffrey's car.  According to Jeffrey, defendant then pointed a gun at him through the passenger window.  Jeffrey, fearing for his safety, swerved his vehicle into defendant's car.  Sharpe lost control of the car, which started spinning.  Defendant shot several times at Jeffrey and one bullet hit Jeffrey's car.  Defendant claimed he shot in self-defense only after Jeffrey swerved into his car.

Jeffrey's car was damaged, but he managed to drive a short distance and then run for help.  Meanwhile, defendant's car, which had become disabled on the freeway, was hit by two other passing motorists.

When law enforcement arrived, defendant was untruthful about the events leading up to the collision, initially claiming Jeffrey's car had sideswiped his vehicle for no

3

reason. He did not inform the officers about shooting at Jeffrey's car. Police eventually recovered a semiautomatic handgun in the spare tire compartment of defendant's car, and two spent casings were found on the freeway shoulder that matched the ammunition in the gun.

### B. Trial Proceedings

A March 2012 information jointly charged defendant and Sharpe with attempted second degree robbery (§ 21a, 211, 212.5, subd. (c), 213, subd. (b), count 1), assault with a semiautomatic firearm (§ 245, subd. (b), count 2), shooting at an occupied motor vehicle (§ 246, count 3), exhibiting a firearm at an occupied motor vehicle (§ 417.3, count 4), and carrying a loaded firearm with felonious intent (§ 12023, subd. (a), count 5). Defendant was charged with an additional count of pimping (§ 266h, subd. (a), count 7), while Sharpe was charged with permitting the discharge of a firearm from a vehicle (§ 12034, subd. (b), count 6).

### 1. Jury Selection

Jury selection began in May 2013. During voir dire, both the prosecutor and defense counsel asked questions about the panel's feelings or perceptions of homosexuality and sexual orientation since defendant and several witnesses were gay. No one on the panel responded that they would have a problem deciding the case based on the facts and not on the ground of sexual orientation.

Based on answers given during voir dire, it became known that two men in the jury venire were openly gay. In discussing their general biographical information, prospective jurors D.J. and S.L., both explained that they lived with their male partners.

D.J. had a doctorate degree from U.C. Berkeley in molecular biology, and was the director of a biodramatic company that specialized in growing microorganisms to prevent crop damage. He disclosed that he knew a public defender in Yolo County where the case was being tried. She was originally his kickboxing instructor, but they had since

4

become friends and he said he knew her "fairly well." He admitted having lunch with her the previous day, and also that he had recently attended her baby shower. He estimated he saw her about once a week, and disclosed that she visited his home.

The public defender had discussed her work with D.J., although she did not disclose specific details of her cases to him. She had also told him about different attorneys in the Public Defender's office as well as the District Attorney's office. She had never mentioned the prosecutor assigned to try defendant, however.

D.J.'s public defender friend told him that "she would never go to the dark side," which D.J. explained meant that she would never become a district attorney. Following up on this statement, the prosecutor asked whether because he was purportedly from "the dark side" that D.J. believed the charges were somehow contrived or that his ability to listen to the evidence and apply the law would be affected. D.J. responded that the term "dark side" was her term not his, and that he could make a decision based on the facts of the case.

D.J. conceded that he was biased or prejudiced about firearms and that he strongly believed the Second Amendment should be revoked. Despite his dislike of guns, D.J. said this bias would not prevent him from following the judge's instructions. In probing this topic further, the prosecutor asked whether there were any other biases, besides his bias against the Second Amendment, of which they should be aware. D.J. responded: "No, I think that's about it, you know, based on what I know about this case, that would be [the] only thing." A short time later, the prosecutor exercised a peremptory challenge excusing D.J.

Following the questioning of seven other prospective jurors and more peremptory challenges from both the prosecution and defense, S.L. was called into the jury box. Before inquiring about biographical information, the court asked whether any of the new potential jurors, including S.L., had any responses to or concerns about the issues raised by any previous questions posed by the court or the attorneys during voir dire. S.L. did

5

not express any concerns with any prior questions or topics, nor did he offer any reason why he could not be impartial if picked for the jury.

S.L. explained that he had graduated from high school and owned a travel agency. He had no prior jury service and said there was "absolutely no reason why [he could not] be fair."

When it was counsel's turn to question the new panel members, defendant's counsel asked if there was anything anyone would like to say to respond to one of his questions. No one answered, and defendant's counsel then said he had no more questions. Sharpe's counsel also had no questions for the new group of potential jurors.

The prosecutor asked S.L. whether he could listen to testimony from a witness who had visited a male prostitute and judge their credibility fairly. S.L. responded that he "definitely" could listen to such testimony without prejudging the witness. S.L. also responded "no" when asked by the prosecutor whether he believed that persons engaged in illegal activities deserve what they get for engaging in such activities. He said, "yes" when asked whether if selected he could share his opinion about the facts of the case, work with others in applying those facts to the law, and use his common sense. A short time later, the prosecutor peremptorily excused S.L.

Following S.L.'s excusal, Sharpe's counsel made a *Wheeler* motion, arguing the prosecutor had systematically used his peremptory challenges to excuse the only two openly gay men in the jury venire. Defendant's counsel joined in the motion. While Sharpe's counsel acknowledged that D.J. had apparently been good friends with the Yolo County public defender, he nonetheless argued that he could see no other reason why he or S.L. were excused except for them being openly gay men.

Although the court was not sure whether sexuality was a proper subject for a *Wheeler* motion, he allowed the motion "out of an abundance of caution. . . ." The prosecutor then gave his reasons for striking both potential jurors.

6

According to the prosecutor, he excused D.J. based on his close relationship with the Yolo County public defender. He noted that D.J. had recently gone to her baby shower and that she had discussed the personality traits of several district attorneys in the prosecutor's office with him. He also cited D.J.'s statement that the public defender considered district attorneys as "the dark side," and stated that he did not believe the People could get a "fair shake in the case" from D.J.

He excused S.L. based on his demeanor. The prosecutor said that when defendant's counsel got up, he observed that S.L. changed his body posture, leaned forward, and seemed to be more attentive. In contrast, when he spoke with him, the prosecutor perceived that S.L. seemed to be leaning back more and that his answers were very short and not descriptive. Neither defendant's counsel nor Sharpe's counsel contradicted the prosecutor's description of S.L.'s demeanor.

After offering the above reasons, the prosecutor then added that in a case like this where the victim was "not out of the closet and actually was untruthful with the police about the extent of his relationship with a male prostitute," that he believed an openly gay person might hold a biased view of the testimony of such a witness because the witness was willing to lie about or not be open regarding his sexuality. Sharpe's counsel responded, "Under that justification, anyone who is openly gay automatically that serves as a purpose for the DA to kick them, their logic seems to be backwards."

The court denied the *Wheeler* motion. Citing D.J.'s close personal relationship with the public defender, his conversations with her about members of the District Attorneys' office as well as the Public Defender's office, and the "dark side" comment, the court found the prosecutor was amply justified in excusing D.J. for nondiscriminatory reasons. The court also accepted the prosecutor's demeanor-based observations regarding S.L., stating: "With regard to [S.L.], the observations of body posturing, his answers being short and not descriptive, I don't find that that would signify a wholesale basis on prosecution's part of excluding those who are openly or even gay."

7

## 2. *The Verdict*

The jury convicted defendant of all counts except the pimping charge. It also found true an arming allegation attached to the attempted robbery charge and a firearm use allegation attached to the assault with a semiautomatic firearm charge, while finding the other alleged firearm enhancements not true. Defendant was sentenced to six years in state prison as follows: for the count 2 assault charge, the low term of three years plus three years for the attached section 12022.5, subd. (a) firearm enhancement. The court sentenced defendant to concurrent terms of 16 months for the count 1 attempted robbery charge and the count 5 carrying a loaded firearm with the intent to commit a felony charge. The court stayed the sentences on the count 3 shooting at an occupied motor vehicle offense, the count 4 drawing or exhibiting a firearm against a person in a motor vehicle charge, and the section 12022, subd. (a)(1) firearm enhancement attached to count 1.

DISCUSSION

I

*Batson/Wheeler Challenge*

Defendant contends the trial court erred in denying his *Batson/Wheeler* motion because, in his view, the prosecutor impermissibly excused two openly gay jurors based solely on their sexual orientation thereby denying him his constitutional rights to due process, equal protection, and a fair and impartial jury. We note that an objection under *Wheeler* also preserves a *Batson* claim on appeal. (*People v. Lenix* (2008) 44 Cal.4th 602, 610, fn. 5 (*Lenix*).)

A.     *General Principles for Evaluating Peremptory Challenges*

Both the state and federal Constitutions prohibit using peremptory challenges to remove prospective jurors based solely on group bias. (*Wheeler, supra,* 22 Cal.3d at

8

p. 272; *Batson, supra,* 476 U.S. at p. 84.) "It is well settled that '[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias--that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"--violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 898 (*Hamilton*); *Wheeler, supra,* 22 Cal.3d at p. 272.) "Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution." (*Hamilton,* at p. 898; *Batson, supra,* 476 U.S. at p. 88.)

Although the United States Supreme Court has yet to address whether *Batson* extends to sexual orientation, the Ninth Circuit held in *SmithKline Beecham Corp. v. Abbott Labs.* (9th Cir. 2014) 740 F.3d 471, 484 (*SmithKline*), that equal protection prohibits peremptory strikes based on sexual orientation under *Batson*. In doing so, the court relied heavily on the Supreme Court's decision in *United States v. Windsor* (2013) --U.S.-- [186 L.Ed.2d 808], which held that the Defense of Marriage Act's definition of marriage as excluding same sex partners violated equal protection and due process. Similarly, our colleagues in the Fourth District have found that excluding gay men and lesbians on the basis of group bias violates the California Constitution. (*People v. Garcia* (2000) 77 Cal.App.4th 1269, 1275, 1280-1281 (*Garcia*) [noting that lesbians and gay men share a history of persecution comparable to that of Blacks and women].) Like *Garcia* and *SmithKline*, we, too, find that excluding prospective jurors solely on the basis of sexual orientation runs afoul of the constitutional principles espoused in *Batson/Wheeler*.

To determine whether a prosecutor impermissibly used peremptory challenges to remove prospective jurors based on a group bias such as sexual orientation, courts engage in a three-part analysis. (*Hamilton, supra,* 45 Cal.4th at pp. 899-900.) A defendant must first make a prima facie case by demonstrating that the facts give rise to an inference of

9

discriminatory purpose.  (*People v. Cornwell* (2005) 37 Cal.4th 50, 66 (*Cornwell*), disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*).)  If that showing is made, the burden next shifts to the prosecution to explain its challenge on the basis of permissible, group-neutral justifications.  (*Id.* at pp. 66-67.)  If such an explanation is offered, the trial court then must decide whether defendant has established purposeful group discrimination.  (*Id.* at p. 67; *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 138] (*Johnson*).)

Because the prosecutor gave reasons for his peremptory challenges, we proceed directly to the second and third steps of the *Batson/Wheeler* analysis and determine whether the trial court erred in concluding that the proffered reasons were nondiscriminatory.  (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1106, disapproved on other grounds in *Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

" 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.' "  (*Hamilton, supra,* 45 Cal.4th at p. 901.)  A prosecutor's justification, moreover, need not support a challenge for cause (*Batson, supra,* 476 U.S. at p. 97), and even a trivial reason, a hunch, or an arbitrary exclusion, if genuine and neutral, will suffice.  (*Hamilton,* at p. 901.)

We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges with great restraint.  (*People v. Thomas* (2011) 51 Cal.4th 449, 474.)  The trial court's determination is a factual one, and as long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal when they are supported by substantial evidence.  (*Hamilton, supra,* 45 Cal.4th at pp. 900-901; *Thomas,* at p. 474.)  In essence, the issue is whether the trial court finds the prosecutor's explanation to be credible, based on factors such as the reasonableness of the explanation, the prosecutor's demeanor, and the trial court's own observations of the voir

10

dire. (*Lenix, supra,* 44 Cal.4th at p. 613.) With these principles in mind, we turn to the specific peremptory challenges under review.

> B. *The Peremptory Challenges of Prospective Jurors D.J. and S.L.*

The prosecutor stated that he challenged D.J. based on his close personal relationship with a Yolo County public defender who had discussed other attorneys' in the prosecutor's office and had referred to his office as the "dark side." Given these facts, the prosecutor believed he could not get a "fair shake" from D.J. The prosecutor explained that he excused S.L. based on his short answers to his questions and his demeanor towards defense counsel, which the prosecutor perceived as more favorable than when he questioned S.L.

The prosecutor then proffered a third reason, apparently applicable to both D.J. and S.L., that as openly gay men, he believed they might be biased against the prosecution's main witness, who had visited a gay male prostitute but lied about it to police and who was not otherwise living an openly gay lifestyle.

The first two reasons given--that D.J. had a close personal relationship with a public defender that may have made him less sympathetic to the prosecution and that S.L. had an unfavorable demeanor--are clearly permissible because they do not facially invoke group bias. (*Lenix, supra,* 44 Cal.4th at p. 623 [perceived bias against prosecution may be legitimate reason to strike potential juror]; see also *id.* at p. 613 ["A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons"]; *People v. Reynoso* (2003) 31 Cal.4th 903, 924-925 [acknowledging that a prosecutor can lawfully peremptorily excuse prospective juror where he "observed the potential juror glare at him, or smile at the defendant or defense counsel"].) The third reason--the assumption that openly gay men may harbor a bias or hostility towards a witness who was not openly gay--is troubling, however.

11

Defendant argues the proffered reason is outrightly discriminatory against openly gay persons, and, thus, it does not constitute a neutral explanation for excusing these two jurors. The reason, in his view, is no different from a similar one rejected in *Batson*: a prosecutor cannot assume a prospective juror would be more partial to a defendant of the same race. (*Batson, supra,* 476 U.S. at p. 97 [recognizing that the Equal Protection Clause "forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is [B]lack"].)

We are not entirely persuaded, however, that defendant has fully characterized the nature of the prosecutor's challenge. The record, we believe, can also be read to indicate a concern not about sexual orientation, but rather a concern about an underlying attitude or belief regarding truthfulness. The reason for the challenge, then, is arguably more nuanced than defendant contends.

A challenge based solely on a prospective juror's membership in a particular group is different from a challenge " 'which may find its roots in part [in] the juror's attitude about the justice system and about society which may be [group] related.' " (*Hamilton, supra* 45 Cal.4th at pp. 901-902.) In *Hamilton*, for example, the California Supreme Court upheld a peremptory challenge where the prosecutor said one of the reasons he struck the prospective juror was because he had " 'considerable sympathy for Black people on trial' and thought the justice system was unfair to Blacks." (*Hamilton, supra,* 45 Cal.4th at p. 901.) In finding substantial evidence supported the challenge, the court implicitly rejected the defendant's argument that the reason was not race neutral but rather based on race itself. (*Id.* at pp. 901-902.) The court found the juror's responses to several questions on the juror questionnaire form indicated that the prospective juror harbored a skepticism regarding the fair treatment of Blacks within the criminal justice system, thus supporting the prosecutor's concerns, even if tangentially related to race. (*Id.* at p. 902.)

Likewise, in *People v. Martin* (1998) 64 Cal.App.4th 378, 385 (*Martin*), the court found that the peremptory challenge of a juror on the basis of the juror's relevant personal values is not improper even though those views may be founded in the juror's religious beliefs. There, the prosecutor struck a Jehovah's Witness because, in his experience, they had a hard time with criminal trials as " 'they couldn't judge anybody at all.' " (*Id.* at p. 381.) Although the prospective juror "did not express actual reservations about her ability to deliberate," the court nevertheless found that "[t]he prosecutor's perception that the juror's religious views might render her uncomfortable with sitting in judgment of a fellow human being was a specific bias related to the individual juror's suitability for jury service" sufficient to support the strike. (*Id.* at p. 384.)

In *Hernandez v. New York* (1991) 500 U.S. 352, 372 [114 L.Ed.2d 395, 414] (*Hernandez*), the United States Supreme Court affirmed the trial court's factual finding that the prosecutor's reason for striking two Latino jurors was race-neutral and genuine. The prosecutor said he excused the jurors because their demeanor and specific responses caused him to doubt their ability to defer to the official translation of the Spanish-language testimony anticipated from various trial witnesses. (*Id.* at pp. 356-357 (plurality opinion).) The fact that the prosecutor's reasoning might disproportionately affect prospective Latino jurors did not render the reason nonneutral. (*Id.* at pp. 361-362.)

In her concurring opinion, Justice O'Connor observed that the prosecutor's peremptory challenges "may have acted like strikes based on race, but they were *not* based on race. No matter how closely tied or significantly correlated to race the explanation for a peremptory strike may be, the strike does not implicate the Equal Protection Clause unless is it based on race." (*Hernandez, supra,* 500 U.S. at p. 375, O'Connor, J., concurring in judgment.) She also noted that *Batson* "does not require that the [prosecutor's] justification be unrelated to race. *Batson* requires only that the prosecutor's reason for striking a juror not *be* the juror's race." (*Ibid.*)

In this case, the prosecutor was clearly concerned about how potential jurors would relate to or judge the credibility of someone who had lied about certain aspects of his life as had the prosecution's main witness. He asked whether potential jurors would automatically disregard the believability of persons who "may be liars, may be cheaters on other people in their own lives." Defense counsel asked similar questions regarding lying and the different motivations for lying. The topic of truthfulness appeared important to both sides, the prosecutor could have genuinely been concerned with potential jurors' beliefs regarding a witness's purported truthfulness or, more appropriately, lack of truthfulness that was related to the facts presented by this specific case.

The prosecutor, moreover, specifically questioned prospective jurors on whether "anybody [had] an automatic reaction where they would vote guilty or not guilty because some of the people involved in this case, either witnesses or people who are accused are homosexual." No one responded in the affirmative. One inference from this line of questioning is that the prosecutor sought to ferret out any biases *for or against* gay persons, and not that he was trying to oust all gay people from serving on the jury. This is especially so since the victim had visited a gay male prostitute, and the defendant was the prostitute's former boyfriend. (*Hernandez, supra,* 500 U.S. at p. 370 (plurality opinion) [recognizing that the Latino ethnicity of the victims and prosecution witnesses tended to undercut any motive to exclude Latinos from the jury, a factor the trial court could have relied on in finding the prosecutor's proffered reason was not race-based].)

The prosecutor also asked whether the venire believed a person might be motivated to lie if he was not necessarily open about his sexuality. This question probed whether jurors could understand the motivation to lie under such circumstances and thus was an attempt to discern whether they would be empathetic to Jeffrey, the prosecution's primary witness.

14

As far as we can tell from the voir dire transcript, however, the trial court never actually considered the prosecutor's sexual orientation-related ground. Although we generally defer to a trial court's factual findings under *Batson/Wheeler* (*Hamilton, supra,* 45 Cal.4th at pp. 900-901), because the court did not address the reason we do not simply presume the court found it neutral and nondiscriminatory. (See e.g., *Snyder v. Louisiana* (2008) 552 U.S. 472, 479 [170 L.Ed.2d 175, 182] (*Snyder*) [court would not presume trial court relied on demeanor-based reason offered by the prosecutor to uphold challenge where the record did not show that the trial judge actually made a determination concerning the prospective juror's demeanor]; *Thaler v. Haynes* (2010) 559 U.S. 43, 48-49 [175 L.Ed.2d 1003, 1008] (*Thaler*) [explaining *Snyder* as follows: "We concluded [in *Snyder*] that the record refuted the explanation that was not based on demeanor and, in light of the particular circumstances of the case, we held that the peremptory challenge could not be sustained on the demeanor-based ground, which might not have figured in the trial judge's unexplained ruling"].) Given the evidence in the record, and in light of the important constitutional rights at stake (*Miller-El v. Dretke* (2005) 545 U.S. 231, 238 [162 L.Ed.2d 196, 212] ["When the government's choice of jurors is tainted with [] bias, that 'overt wrong . . . casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial. . . .' "]), we err on the side of constitutional caution by finding that the prosecutor's third reason was sexual orientation-based as defendant argues.

This conclusion does not end our inquiry, however. Instead, it compels us to examine how to evaluate a *Batson/Wheeler* challenge when a party gives both permissible and impermissible reasons for exercising a strike. Although other jurisdictions have considered the issue, we are not aware of, and the parties have not cited, any published United States Supreme Court or California appellate court case deciding the matter. (See e.g., *Snyder, supra,* 552 U.S. at p. 485 [discussing but not deciding whether mixed-motive analysis applies in *Batson* context]; *People v. Schmeck*

15

(2005) 37 Cal.4th 240, 276-277 (*Schmeck*) [declining to address whether a mixed-motive analysis provided the proper analytical framework when a prosecutor relies in part on an impermissible class bias because the prosecutor's reasons were not pretextual], abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610, 637-638; *People v. Fiu* (2008) 165 Cal.App.4th 360, 397, fn. 49 [finding defendant's mixed-motive argument moot because the court was not persuaded that any of the three reasons the prosecutor proffered were race-based].)

Defendant urges us to adopt a per se rule of unconstitutionality. He contends that when a party offers multiple rationales for a peremptory strike, some of which are permissible and one of which is not, the taint from the impermissible reason mandates reversal and essentially moots any other neutral reason given.

Several state jurisdictions have adopted this approach, which is known as the "per se" or "tainted" approach. (See e.g., *McCormick v. State* (Ind. 2004) 803 N.E.2d 1108, 1112-1113 [collecting cases adopting the tainted approach].) Under the per se approach, "a racially discriminatory peremptory challenge in violation of *Batson* cannot be saved because the proponent of the strike puts forth a nondiscriminatory reason." (*State [South Carolina] v. Shuler* (2001) 344 S.C. 604, 616 [545 S.E.2d 805, 811]; see also *State v. King* (Wis.Ct.App. 1997) 215 Wis.2d 295, 307 [572 N.W.2d 530, 535] ["where the challenged party admits reliance on a prohibited discriminatory characteristic . . . a response that other factors were also used is [in]sufficient rebuttal under the second prong of *Batson*"].)

Still other jurisdictions, primarily federal, have adopted a mixed-motive or dual motivation analysis from other non*Batson* equal protection decisions. (See e.g., *Howard v. Senkowski* (2d Cir. 1993) 986 F.2d 24, 27 (*Howard*); *Gattis v. Snyder* (3d Cir. Del. 2002) 278 F.3d 222, 233; *Jones v. Plaster* (4th Cir. 1995) 57 F.3d 417, 420-422; *United States v. Darden* (8th Cir. 1995) 70 F.3d 1507, 1530-1532; *Wallace v. Morrison* (11th Cir. 1996) 87 F.3d 1271, 1274-1275.) Under the mixed-motive approach, "[o]nce the

16

claimant has proven improper motivation, dual motivation analysis is available to the person accused of discrimination to avoid liability by showing that the same action would have been taken in the absence of the improper motivation that the claimant has proven." (*Howard, supra,* 986 F.2d at p. 27.) Stated differently, "after the defendant makes a *prima facie* showing of discrimination, the state may raise the affirmative defense that the strike would have been exercised on the basis of the []neutral reasons and in the absence of the discriminatory motive. If the state makes such a showing, the peremptory challenge survives constitutional scrutiny." (*Gattis, supra,* 278 F.3d at p. 233.)

The Ninth Circuit has adopted a third approach known as the substantial motivating factor approach. (See *Cook v. LaMarque* (9th Cir. 2010) 593 F.3d 810, 814-815 (*Cook*).) Relying on language in the Supreme Court's decision in *Snyder*, the *Cook* court expressly declined to adopt the mixed-motive analysis for *Batson* cases and instead limited its inquiry to "whether the prosecutor was 'motivated in substantial part by discriminatory intent.' " (*Id.* at p. 815.) "To determine whether race was a substantial motivating factor--that is, whether the defendant has shown 'purposeful discrimination' at *Batson*'s third step--the trier of fact must evaluate 'the persuasiveness of the justification[s]' offered by the prosecutor." (*Ibid.*) The test, in essence, is *stricter* than the mixed-motive analysis because it does not permit the prosecutor to establish the affirmative defense that he would have challenged the juror even absent the discriminatory basis. (See *Kesser v. Cambra* (9th Cir. Cal. 2006) 465 F.3d 351, 376, Berzon, J., concurring opn. [explaining that on a direct appeal she might hold that the *Batson* standard should be more onerous than ordinary equal protection jurisprudence].)

In deciding which of the three approaches should apply here, we are guided by United States Supreme Court precedent as well as California case law in other contexts. Such cases lead us to conclude that neither the per se approach nor the substantial motivating factor approach are appropriate. Instead, we conclude that a court should

utilize the mixed-motive approach to determine the constitutionality of a peremptory strike whenever a party gives both neutral and nonneutral reasons for the strike.

The United States Supreme Court's decision in *Rice v. Collins* (2006) 546 U.S. 333, 336 [163 L.Ed.2d 824, 830] (*Rice*) convinces us that the per se approach does not apply when evaluating such challenges. In that case, the prosecutor gave several race-neutral reasons for striking an African-American juror including that he wanted to obtain gender balance on the jury. (*Id.* at p. 340.) On a habeas petition, the Ninth Circuit found the gender justification undermined the prosecutor's credibility regarding the other race-neutral reasons offered for the strike thus rendering the trial court's factual finding of no pretext unreasonable. (*Ibid.*)

After first acknowledging that discrimination in the jury selection process based on gender violates the Equal Protection Clause (*Rice, supra,* 546 U.S. at p. 340, citing *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127 [128 L.Ed.2d 89]), the Supreme Court nevertheless concluded that the Ninth Circuit had "assigned the gender justification more weight than it can bear." (*Rice,* at pp. 340-341.) The courted noted that, "[t]he prosecutor provided a number of other permissible and plausible race-neutral reasons, and [the defendant] provide[d] no argument why this portion of the colloquy demonstrates that a reasonable factfinder must conclude the prosecutor lied about the eye rolling and struck [the juror] based on her race." (*Id.* at p. 341.) Had the per se approach applied, the Supreme Court would have found the improper gender justification controlling even if the other reasons given were race-neutral. It did not.

We also reject the approach adopted by the Ninth Circuit in *Cook*. (*Cook, supra,* 593 F.3d at pp. 814-815.) The Ninth Circuit cited *Snyder* to support its decision to reject the mixed-motive analysis (*ibid.*), characterizing the high court's opinion as "declining to adopt" the mixed-motive approach. (*Id.* at p. 814.) We do not read *Snyder* so broadly.

Rather than rejecting the mixed-motive analysis as *Cook* implies, *Snyder* merely found that it "need not decide" the issue. (*Snyder, supra,* 552 U.S. at p. 485 ["In other

18

circumstances, we have held that, once it is shown that a discriminatory intent was a substantial or motivating factor in an action taken by a state actor, the burden shifts to the party defending the action to show that this factor was not determinative. [Citation.] We have not previously applied this rule in a *Batson* case, and we need not decide here whether that standard governs in this context"].) This was because the court found that the reasons proffered by the prosecutor were pretextual and not supported by the record; thus, the court had no occasion to consider the governing standard in a dual motivation case where the prosecutor offers both permissible and impermissible reasons for a strike. (*Id.* at pp. 484-485; *Palmer v. GTE California Inc.* (2003) 30 Cal.4th 1265, 1278 [" ' "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered" ' "].)

 *Snyder*, moreover, recognized that, at a minimum, a party defending a peremptory challenge motivated in substantial part by a discriminatory factor must show that the factor was not determinative. (*Snyder, supra,* 552 U.S. at p. 485 ["For present purposes, it is enough to recognize that a peremptory strike shown to have been motivated in substantial part by discriminatory intent could not be sustained based on any lesser showing by the prosecution"].) In light of the circumstances presented in *Snyder*, "including absence of anything in the record showing that the trial judge credited the claim that Mr. Brooks was nervous, the prosecution's description of both of its proffered explanations as 'main concern[s],' [citation], and the adverse inference [of discriminatory intent following the proffer of a pretextual reason] . . . the record [did] not show that the prosecution would have pre-emptively challenged Mr. Brooks based on his nervousness alone." (*Ibid.*)

 The above discussion, we believe, illustrates that the mixed-motive approach can be successfully applied in the *Batson/Wheeler* context even though admittedly there may be some difficulty in determining the "subtle question of causation." (*Snyder, supra,* 552

U.S. at p. 486; see also *Khan v. State* (Md. Ct. Spec. App. 2013) 74 A.3d 844, 852, fn. 3 [discussing practical application problems of determining but for causation for peremptory challenges].)

The mixed-motive approach is also consistent with United States Supreme Court equal protection precedent in other non*Batson* contexts as well as other California equal protection case law. (See e.g., *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle* (1977) 429 U.S. 274, 287 [50 L.Ed.2d 471, 483-484] (*Mount Healthy*) [district court should have determined whether the board of education could show by a preponderance of evidence that it would have reached the same decision not to rehire a teacher who engaged in constitutionally protected speech in the absence of the teacher's protected conduct]; see also *Village of Arlington Heights v. Metro. Hous. Dev. Corp.* (1977) 429 U.S. 252, 271 [50 L.Ed.2d 450, 468] [plaintiffs failed to carry their burden of showing that a discriminatory purpose was a substantial motivating factor in an agency's decision to deny a rezoning application]; *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 211 (*Harris*) [former employee not entitled to damages or reinstatement when a jury finds that unlawful discrimination was a substantial motivating factor in employee's termination but the employer proves it would have made the same decision absent such discrimination; former employee may be entitled to declaratory or injunctive relief to stop discriminatory practices].) And *Batson* itself states that, "[a] recurring question in these [jury discrimination] cases, *as in any case alleging a violation of the Equal Protection Clause*, was whether the defendant had met his burden of proving purposeful discrimination on the part of the State." (*Batson, supra,* 476 U.S. at p. 90; italics added.) As *Senkowski* recognized, *Batson* thus "plac[ed] the issue squarely within the tradition of equal protection jurisprudence." (*Senkowski, supra,* 986 F.2d at p. 27.)

Applying that analysis here, it is not apparent from the transcript whether the trial court ever considered the prosecutor's sexual orientation-based reason let alone concluded that it was a motivating but not determinative factor in the decision to strike

D.J. and S.L.  To properly resolve the issue, then, we must remand the case for further proceedings so the trial court may apply a mixed-motive analysis to the peremptory challenges.  On remand, the prosecutor shall have the opportunity to show that he would have stricken both jurors even without considering their sexual orientation.  (See *Mount Healthy, supra,* 429 U.S. at p. 287; *Harris, supra,* 56 Cal.4th at p. 211].)  If the prosecutor makes the necessary showing, the challenges stand.  If not, the judgment must be reversed.  (*Snyder, supra,* 552 U.S. at p. 486 [reversed and remanded after finding *Batson* violation].)

II

*Instructional Error*

Defendant contends the court erred in instructing the jury on attempted robbery. He claims CALCRIM No. 460, the pattern jury instruction defining attempt, included an impermissibly vague definition of the crime's actus reus element and created a mandatory presumption of intent thereby lessening the prosecution's burden of proof.  We disagree.

A court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence in a criminal case.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  That obligation means instructing on all elements of a charged offense (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311), including "the intent necessary to commit the offense and the union between that intent and the defendant's act or conduct.  [Citations.]"  (*People v. Alvarado* (2005) 125 Cal.App.4th 1179, 1185.)

A particular instruction " 'may not be judged in artificial isolation . . . .' "  (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 399] (*Estelle*).)  Instead, "[o]n review, we examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt.  [Citation.]"  (*People*

21

*v. Paysinger* (2009) 174 Cal.App.4th 26, 30 (*Paysinger*).) A party, moreover, " 'may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Jones* (2013) 57 Cal.4th 899, 969.)

Before considering defendant's contention, we first address the People's argument that defendant forfeited his instructional challenge by failing to object below. While defendant acknowledges the People's forfeiture argument, he does not address it.

It is undisputed that defendant did not object to the instruction as given. There is also evidence in the record that defense counsel may have even requested the instruction. When the court mentioned CALCRIM No. 460, for example, defendant's counsel stated, "We want it . . . ," and "[i]t's to be included. . . ."

"Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.) Furthermore, when defense counsel deliberately requests a particular instruction the invited error doctrine bars an argument on appeal that the instruction was erroneous. (*People v. Wader* (1993) 5 Cal.4th 610, 657-658 (*Wader*); *People v. Lucero* (2000) 23 Cal.4th 692, 723.)

We may, however, review any instruction given, even though no objection was made below, if the substantial rights of the defendant were affected. (§ 1259.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim--at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) Courts have also recognized that a defendant who is barred from raising instructional error by the invited error doctrine may still claim he received ineffective assistance of counsel. (*Wader, supra,* 5 Cal.4th at pp. 657-658.) To determine whether defendant's substantial rights were affected and to forestall a potential ineffective assistance claim in a subsequent habeas

22

petition (*People v. Salcido* (2008) 44 Cal.4th 93, 152 [recognizing ineffective assistance claims often more appropriately litigated on habeas corpus]), we turn to defendant's instructional error challenge.

Penal Code section 21a provides that "[a]n attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) CALCRIM No. 460 is the pattern jury instruction for an attempt. Based on CALCRIM No. 460, the court instructed the jury as follows: "The defendants are charged in Count 1 with attempted robbery.

"To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant took a direct but ineffective step toward committing robbery; and [¶] 2. The defendant intended to commit robbery.

"A direct step requires more than merely planning or preparing to commit robbery or obtaining or arranging for something needed to commit robbery. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to commit robbery. It is a direct movement towards the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

"A person who attempts to commit robbery is guilty of attempted robbery even if, after taking a direct step towards committing the crime, he or she abandoned further efforts to complete the crime or if his or her attempt failed or was interrupted by someone or something beyond his or her control. On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing the robbery, then that person is not guilty of the attempted robbery.

"To decide whether the defendant intended to commit robbery, please refer to the separate instructions I'll give you on that crime."

23

The court then instructed the jury with CALCRIM No. 1600, the pattern jury instruction for robbery. The court stated in relevant part: "To prove the elements of robbery, a violation of Penal Code section 211, the People must prove that: [¶] 1. The defendant took property that was not his own; [¶] 2. The property was taken from another person's possession and immediate presence; [¶] 3. The property was taken against that person's will; [¶] 4. The defendant used force or fear to take the property or to prevent the person from resisting; and [¶] 5. When the defendant used force or fear to take the property, he intended to deprive the owner of it permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property.

"The defendant's intent to take the property must have been formed before or during the time he used force or fear. If the defendant did not form this required intent until after using the force or fear, then he did not commit the robbery. . . ."

Defendant first argues that CALCRIM No. 460 is impermissibly vague because it does not adequately define the actus reus of an attempt. He complains it deprived him of due process because the instruction's definition of "direct step[]" is, in essence, not a bright line rule clearly delineating between mere preparation and an overt act towards a robbery. According to defendant, the concept of "a direct but ineffective step" is a "content-less variable[] on a shifting spectrum of conduct" that allowed the jury to form "arbitrary and subjective impressions as to what might constitute non-preparatory but ineffectual, direct steps."

To support his vagueness argument, defendant cites cases observing that it sometimes can be difficult to discern when preparation ends and attempt begins for purposes of an attempt crime. (See e.g., *People v. Watkins* (2012) 55 Cal.4th 999, 1021 ["the act must represent ' "some appreciable fragment of the crime" ' "; *People v. Superior Court (Decker)* (2007) 41 Cal.4th 1,8 ["As simple as it is to state the terminology for the law of attempt, it is not always clear in practice how to apply it. As

24

other courts have observed, ' "[m]uch ink has been spilt in an attempt to arrive at a satisfactory standard for telling where preparation ends and attempt begins" ' "].)  But simply because there may be difficulty in determining whether some hypothetical act constitutes a direct step towards a robbery does not render the instruction vague.  (See e.g., *People v. Morgan* (2007) 42 Cal.4th 593, 606 [statute is not void despite difficulty in determining whether some marginal act is covered by its language] (*Morgan*).)

As the Supreme Court has recognized, " '[t]he law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as "reasonable," "prudent," "necessary and proper," "substantial," and the like.  Indeed, a wide spectrum of human activities is regulated by such terms. . . .' " (*Morgan, supra,* 42 Cal.4th at p. 606.)  " 'Yet standards of this kind are not impermissibly vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.' " (*Ibid.*)

The same reasoning applies to CALCRIM No. 460's definition of a "direct step," which we conclude is not impermissibly vague.  The instruction makes clear that a "direct step" is one that "immediate[ly]" puts a prior plan to commit an offense into motion.  This language is sufficiently definite to allow the jury to decide between activities related to formulating or preparing the plan and those "immediately" putting the plan, once devised, "into action." (*Morgan, supra,* 42 Cal.4th at pp. 606-607 ["in the context of our simple kidnapping statute, where the adjective 'substantial' modifies the noun 'distance,' the word 'substantial' means a 'significant amount' as contrasted with a distance that is 'trivial,' and that the phrase 'substantial distance' meets the constitutional requirement of reasonable certainty"]; see also *Coolidge v. Standard Acci. Ins. Co.* (1931) 114 Cal.App. 716, 721-722 [interpreting the term "immediately" to mean "promptly without unnecessary delay"].)

"[W]e need not address defendant's perfunctory, undeveloped claim [he] set forth in the footnote" in his opening brief concerning unanimity. (*People v. Carroll* (2014)

25

222 Cal.App.4th 1406, 1412, fn. 5; see also *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 160 [appellate court may disregard points raised in a footnote rather than being property presented under a discrete heading with appropriate analysis].)

Defendant next complains that the language in CALCRIM No. 460 stating, "[a] direct step indicates a definite and unambiguous intent to commit robbery" essentially creates a presumption that he possessed the specific intent to commit the robbery. This improper presumption, in turn, unconstitutionally relieved the State of the burden to prove beyond a reasonable doubt every element of the charged attempted robbery offense.

Defendant cites *Carella v. California* (1989) 491 U.S. 263, 264 [105 L.Ed.2d 218, 221] (*Carella*), where the court improperly instructed the jury with mandatory presumptions regarding the intent to commit fraud by theft and embezzlement. In that case, the "jury was told first that a person 'shall be presumed to have embezzled' a vehicle if it is not returned within 5 days of the expiration of the rental agreement; and, second, that 'intent to commit theft by fraud is presumed' from failure to return rented property within 20 days of demand." (*Id.* at p. 265.)

While the "mandatory" instructions in *Carella* "directly foreclosed independent jury consideration of whether the facts proved established certain elements" of the charged offenses (*Carella, supra,* 491 U.S. at p. 266), CALCRIM No. 460, as given here, does no such thing. Rather than imposing a mandatory presumption on the jury, CALCRIM No. 460 merely provides that a "direct step" towards a robbery "indicates" an intent to commit a robbery. The words "presume" and "indicate" are not synonymous.

"The word 'indicate' is defined to mean, 'To point out or to; to direct to a knowledge of; . . . to be an index, sign or token of; to betoken,' and among its synonyms are 'evidence, evince, manifest.' " (*People v. Smith* (1939) 36 Cal.App.2d Supp. 748, 751, citing Webster's New International Dict. (2d Ed. 1938).) The word "presume," by

26

contrast, means "to assume as true in the absence of proof to the contrary." (Random House Webster's College Dictionary (2d Ed. 1997) p. 1031.)

The language in CALCRIM No. 460 defining what constitutes a "direct step," moreover, cannot be read in isolation. We must view the instruction as a whole, together with the other instructions given by the court. (*Estelle, supra,* 502 U.S. at p. 72; *Paysinger, supra,* 174 Cal.App.4th at p. 30.) Notably, CALCRIM No. 460 also specifically states, "[t]o decide whether the defendant intended to commit robbery, please refer to the separate instructions I'll give you on that crime." The court then instructed the jury with CALCRIM No. 1600 concerning robbery. That instruction, in turn, provides in relevant part that to be guilty of robbery defendant had to intend to deprive a person of his property using force or fear, and that if he formed the intent to take the property after using the force or fear, rather than forming the intent before or during the time he used force or fear, he did not commit a robbery.

Thus, unlike defendant argues, the jury was told that to determine intent it had to apply CALCRIM No. 1600, and not simply presume without actually deciding the intent issue. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) We presume the jury followed the court's instructions here.

We also note that during deliberations the jury asked the court to clarify the difference between first and second degree robbery. After first explaining that defendant was charged with attempted second degree robbery, the court responded: "If you find that the People have proved beyond a reasonable doubt the elements of attempt (Jury Instruction 460), as well as the elements of robbery (Jury Instruction 1600), then the crime if proven in [count] 1 is attempted second-degree robbery." This supplemental instruction further shows that the jury was not simply instructed to presume defendant's intent from CALCRIM No. 460, but rather that it also had to consider CALCRIM No.

1600 to determine whether the prosecution had met its burden of establishing the attempted robbery charge.

CALCRIM No. 460 is not impermissibly vague, and it does not impose a mandatory presumption regarding a defendant's mental state. The court, therefore, did not err in giving the instruction.

DISPOSITION

The judgment is conditionally reversed. The cause is remanded to the trial court to conduct a hearing at which the court shall determine whether the prosecutor's sexual orientation-based reasons for his challenge to D.J. and S.L., while a factor, were not determinative and that there were neutral and nondiscriminatory reasons supporting the challenges. If the trial court finds the latter, the judgment shall be reinstated as of the date of the trial court's ruling to that effect. If the trial court finds that the prosecutor's sexual orientation-based reasons were determinative, that is, there were no supportable neutral and nondiscriminatory reasons for the challenges, the trial court will order a new trial.

      HULL      , J.

We concur:

    BLEASE    , Acting P. J.

    DUARTE    , J.